IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BOOKER T. SHIPP,

                Plaintiff,

v.

KENNETH LOBENSTEIN and DANIEL WINKLESKI,

                Defendants.

OPINION and ORDER

21-cv-167-jdp

---

    Plaintiff Booker T. Shipp, appearing pro se, is a prisoner incarcerated at New Lisbon Correctional Institution. Shipp alleges that prison staff knowingly exposed him to COVID-19 by quarantining him with his cellmate who had tested positive. Shipp brings claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law. Defendants admit that Warden Daniel Winkleski issued a directive keeping Shipp and other COVID-negative prisoners housed together with COVID-positive cellmates, but they argue that Winkleski acted reasonably in taking quarantine measures to stop the spread of COVID-19 during an outbreak at the prison.

    Defendants have filed a motion for summary judgment, which I will grant concerning Shipp's Eighth Amendment claims because Shipp fails to show that Winkleski consciously disregarded the health risk to Shipp and other COVID-negative inmates. Rather, Winkleski considered the risks to inmates and made his decision after relying on guidance from Department of Corrections medical supervisors, choosing a quarantine policy that he believed would slow the spread of COVID-19 among the entire prison population. I will relinquish the court's supplemental jurisdiction over Shipp's state-law claims.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Booker T. Shipp is a prisoner at New Lisbon Correctional Institution (NLCI). Defendants both work at NLCI: Daniel Winkleski is the warden and Kenneth Lobenstein is a unit manager. During the events relevant to this case, Lobenstein was the assigned unit manager of B Unit, where Shipp was housed.

NLCI is a medium security prison with four housing units, each with approximately 125 cells, two inmates to a cell, and a restrictive housing unit with 50 single-occupancy cells. Each of the units were further divided into two "sides," with inmates from one side needing permission to enter the other side. In November 2020, NLCI housed approximately 1,021 inmates.

Starting in March 2020, NLCI issued guidance for inmates and staff in an effort to stop the spread of COVID-19. For instance, NLCI recommended inmates and staff wash hands regularly with soap and water for at least 20 seconds; avoid touching their eyes, nose, and mouth; cover coughs or sneezes; keep their living and work areas clean; wear a mask; and maintain social distancing whenever possible. Winkleski also directed restrictions on inmate movement to mitigate the spread of COVID-19, such as adjustment to dayroom hours to separate quarantined and non-quarantined inmates, distribution of meals and medications to quarantined inmates at cell fronts, suspension of in-person visits, and modification to shower schedules. Shipp disputes that some of these directions were carried out, for instance stating that he never saw meals or medications being delivered at cell fronts, nor were shower schedules modified.

When there were relatively low numbers of COVID-19 infections at NLCI, inmates who tested positive were treated differently from those who were exposed but who did not test positive. An inmate who tested positive was placed on "isolation status" in a single "wet" cell—a cell with its own toilet and sink. Staff cleared a wing of the restrictive housing unit to create 14 isolation cells. And because NLCI's C Unit's 125 cells are wet cells, when there was an outbreak on that unit NLCI was able to move inmates around the unit to create isolation cells on the unit.

Inmates who were close contacts but who did not test positive were placed in "quarantine status." The parties do not discuss the difference between isolation status and quarantine status in detail, but I take them to be saying that quarantined inmates were not placed in wet cells and so they shared the same showers and bathrooms as non-quarantined inmates.

This case is about NLCI's response to a COVID outbreak in October and November 2020. In mid-October, COVID testing was performed on two of the four units at the prison (it does not appear that Shipp's B Unit was tested). There were 50 positive test results. The DOC's Bureau of Health Services COVID policy at the time stated, "Do not place a person who needs to be quarantined with an isolated person. Those already quarantined and/or awaiting test results may need to remain in place with others before moving to avoid possible COVID spread. Consult with BHS for additional questions re: movement of isolated or quarantined [prisoners]." Dkt. 21-2, at 5.

In response to the large number of positive tests, Winkleski sought guidance from high-level DOC medical supervisors. On October 19, 2020, Roslyn Huneke, a nurse who was NLCI's Health Services Unit supervisor, sent an email to DOC Bureau of Health Services Medical

3

Director Dr. Paul Bekx and Associate Medical Director Dr. Daniel La Voie stating in part the following:

> We got most of the results back today and have 50 positive COVID cases from this so have quite a lot of inmates to isolate and quarantine. We do not have wet cells to move all the isolated inmates into, so what I would like to do is isolate and quarantine them in their current cell with their current cellmates. Some of the cellmates tested negative last week. We would quarantine them as close contacts anyways, but usually we can move the positive cases to a different cell. Warden Winkleski asked that I confirm with BHS that isolating and quarantining in place is acceptable. On the [COVID policy] which is attached, in the notes section it states "do not place a person who needs to be quarantined with an isolated person. Those already quarantined and/or awaiting test results may need to remain in place with others before moving to avoid possible COVID spread. . . .
>
> Since the positive cases and their cellmates have been in the same cell for an extended period of time, I would prefer to leave them where they are rather than try to move them around to get 2 positive inmates in the same cell and 2 quarantined inmates in the same cell. If we had open available cells, we could certainly move them but since space is not available, would it be ok to leave them where they are?

*Id.* at 2. The next day, La Voie responded in part:

> What you described is how I think we should handle this outbreak. Cohorting in place is the best option. Everyone is 'locked down in place' with little to no movement. Those 50 positives have already exposed the rest of their unit, including cellmates. Leave in place for at least 2 weeks.

*Id.* Bekx also responded later that day, stating in part, "Whenever feasible possible, it is best to cohort positives and quarantines together—however in situations like this where there is likely already spread from a positive person to the roommate, it makes sense to simply restrict all movement." *Id.* at 1.

On November 2, the Wisconsin National Guard tested the NLCI inmates for COVID-19. On November 5, test results showed that 282 inmates had tested positive. In

4

particular, on Shipp's B Unit, 145 inmates tested positive and 103 tested negative. Shipp tested negative but his cellmate tested positive.

On November 5, Warden Winkleski sent an email to NLCI staff stating that, due to the number of positive cases on the A and B units, he had decided to isolate or quarantine all inmates on those units. Winkleski assumed that because so many B Unit prisoners tested positive, all inmates on that unit sustained prolonged close contact with COVID-positive inmates in the three days after testing occurred but before the results were known. Winkleski decided to follow the guidance provided by Bureau of Health Services supervisors Bekx and La Voie and isolate or quarantine the entire B Unit "in place," meaning that none of these inmates switched cells, and that the inmates who had tested positive were not separated from those like Shipp who had tested negative. This meant that Shipp continued to be housed with a COVID-positive cellmate.

Defendant Unit Manager Lobenstein explained to inmates who were required to quarantine that they would not be allowed to change cells, even if they tested negative, because the entire unit was being placed under isolation/quarantine status. Shipp asked Lobenstein to move him out of his cell with a COVID-positive inmate into a cell with another negative-testing inmate instead. While unit managers generally have authority to assign cells on their units, Lobenstein refused Shipp's request as conflicting with Winkleski's quarantine-in-place order. Shipp states that Lobenstein threatened him with discipline if he failed to comply with the quarantine-in-place order.

Shipp was again tested for COVID-19 on November 10. He tested positive. He suffered from a severe, bloody cough; body aches; headaches; loss of smell; and he vomited. Shipp feared for his health because he already suffered from severely high blood pressure.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

A. Preliminary matters

1. Motion for sanctions

Along with his brief opposing summary judgment, Shipp has filed a motion to sanction defendants for violating Federal Rules of Civil Procedure 26 and 37 by failing to timely disclose the October 2020 emails between Huneke, Bekx, and La Voie discussing whether to implement quarantine-in-place rules given large numbers of positive-testing inmates at NLCI. Dkt. 31. Shipp contends that defendants failed to properly disclose the emails when he asked for them in his first production of documents, dated September 15, 2021, in which Shipp included the following requests:

> #4) Please provide copies of all Covid-19 related memos produced by the Wisconsin Department of Corrections, regarding Covid-19.
>
> . . . .
>
> #7) Please provide any/and all Covid-19 related emails received and/or sent to other prison administrators by defendants.

Dkt. 29-6.

Defendants responded to the request for memos by stating, "Attached are Memoranda and e-mails received by and sent by New Lisbon Correctional Institution regarding COVID-19." Dkt. 37-2, at 3. But the emails included in this batch of 73 pages of documents did not include the October 2020 emails among Huneke, Bekx, and La Voie. Defendants objected to Shipp's request for "Covid-19 related emails" as overly broad and noted that

6

defendants "were in contact with all the institutions in the state and there is an immense amount of emails relating to COVID that would hold no bearing on this case." *Id.* at 3.

Shipp states that defendants' submission of some emails in response to his request regarding memos, along with defendants' statement that many emails held no bearing on the case, led him to believe that they had indeed provided him with all the relevant emails. He states that he was blindsided with the inclusion of the October 2020 emails in defendants' summary judgment materials, and that had he known about these emails sooner he would have amended his complaint to name Huneke, Bekx, and La Voie as defendants for their personal involvement in approving the quarantine-in-place policy. Shipp requests that the court strike the emails as exhibits, enter default judgment, or order defendants to pay expenses caused by the failure to properly disclose.

Defendants argue that they did not violate discovery rules; they state that Shipp did not confer with them regarding his requests for production of documents nor did he file a motion to compel discovery after receiving defendants' objections. They add that in January 2022, Shipp followed with a second set of requests for production of documents, including a request for "a copy of the email, memo, or the name of the person from the Bureau of HEALTH SERVICES that SPECIFICALLY says isolate/cohort confirmed COVID-19 positive inmates with confirmed negative inmates in small prison cells for 14 days." Dkt. 37-3, at 3 (capitalization in original). Counsel for defendants states that he was not aware of the October 20 email chain until he reviewed materials after receiving Shipp's second request. Defendants turned over these emails in early February, a few days after filing their summary judgment motion, which already contained those materials.

7

I will deny Shipp's motion for sanctions because he doesn't show that defendants did anything wrong. Shipp himself contributed to the delay in obtaining the email chain by first filing an extremely broad request for all COVID-19-related emails and did not confer with defendants about the issue or file a motion to compel. He then waited months to amend his requests to appropriately focus on specific emails, by which time defendants had no duty to turn over the emails before filing their motion for summary judgment.

Shipp attempts to sidestep his own delay by saying that he thought that defendants had provided him with all relevant emails because some emails were included in their response to his request for COVID-19-related memos. But this explanation is not plausible in light of his later request for emails specifically about the decision to cell isolated and quarantined inmates together—he wouldn't have made that request if he thought he already had all the relevant emails. Shipp does not show that defendants intentionally withheld the October 20 email chain from him or that it prejudiced his ability to respond to defendants' summary judgment motion. And as I discuss below, the timing of the disclosure of these emails did not prejudice Shipp in terms of naming the correct defendants for his claim because he doesn't have a plausible Eighth Amendment claim about the implementation of the quarantine-in-place policy at NLCI. So I will deny Shipp's motion for sanctions.

### 2. Motion to file sur-reply

Shipp has filed a motion for leave to file a sur-reply to defendants' motion for summary judgment. Dkt. 38. But I ordinarily do not allow sur-replies and Shipp doesn't explain why he thinks one would be appropriate here. I will deny his motion and consider defendants' summary judgment motion on the briefing already submitted.

B. **Eighth Amendment claims**

Shipp contends that defendants knowingly exposed him to COVID-19 by quarantining him with his cellmate who had tested positive rather than moving him to a cell with another inmate who had tested negative. Shipp brings claims under the Eighth Amendment to the United States Constitution.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

1. **Defendant Winkleski**

I will assume for purposes of this opinion that exposing Shipp to the coronavirus was a serious enough risk to Shipp's health to violate the Eighth Amendment. But defendants

contend that Shipp cannot prove that they harmed him. It is undisputed that Shipp tested positive for COVID-19 shortly after defendant Warden Winkleski decided to keep all B Unit inmates in place despite some of them having already tested positive. Defendants argue that Shipp cannot prove that his positive test was caused by Winkleski's quarantine-in-place order because is possible that Shipp had already contracted COVID-19 before Winkleski's order. Even if a jury could reasonably infer that Shipp was indeed infected as a result of Winkleski's quarantine-in-place order, Shipp cannot prevail on his Eighth Amendment claims because he fails to show that Winkleski consciously disregarded his medical needs by implementing the policy.

In considering Shipp's Eighth Amendment claim against Winkleski, I must consider the facts known to Winkleski when he made the decision to keep the B Unit inmates in place and thus failed to order Shipp's transfer away from his COVID-positive cellmate. Winkleski made that decision on November 5, 2020, after the November 2 test results came back indicating that 282 of the 1,021 inmates at NLCI tested positive, including 145 of the 248 inmates on the B Unit.

Shipp contends that Winkleski should have followed the DOC protocol mandating that COVID-positive inmates be isolated and that COVID-negative inmates like Shipp who were close contacts of the infected inmates be quarantined separately from the positive inmates. Shipp argues that Winkleski violated the Eighth Amendment by failing to follow the DOC's COVID-19 policy in pace at the time that explicitly stated, "Do not place a person who needs to be quarantined with an isolated person." Dkt. 21-2, at 5. But a violation of an internal prison policy alone does not violate the Constitution. *See, e.g., Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). And in any event, the DOC's policy stated that its COVID guide

was a "'living' document, subject to changes and guidance" from DOC medical staff and public health officials. *Id.* Winkleski diverged from the DOC policy in part because of additional guidance he received from DOC medical supervisors Bekx and La Voie that it was acceptable to leave COVID-positive inmates and close contacts together to quarantine in place given the logistical challenges with accommodating so many positive cases. Generally, defendant prison officials who are not medical providers are entitled to defer to the decisions of medical staff. *See Giles v. Godinez*, 914 F.3d 1040, 1049–50 (7th Cir. 2019).

Shipp contends that this medical advice was not sound, but rather built on a "foundation of lies." Dkt. 25, at 4. He argues that Health Services Unit Supervisor Huneke—at Winkleski's direction—misled Bekx and La Voie into thinking that there were not enough wet cells in which to isolate COVID-positive inmates at that point (after 50 inmates tested positive in late October 2020). It is undisputed that NLCI has the capacity to hold 300 inmates in wet cells—250 doubled up in C Unit cells and 50 in the restrictive housing unit. Shipp asserts that Huneke lied by failing to mention that there was theoretical wet-cell capacity at NLCI to house these 50 positive-testing inmates in an effort to get DOC officials to authorize departing from the general rule against celling positive-testing inmates with close-contact negative-testing inmates and instead signing off on what Shipp believes was a less effective quarantine-in-place policy. So I take Shipp to be arguing that I should either disregard Bekx and La Voie's approval of the quarantine-in-place policy as based on false information, or consider Huneke's misleading email to be evidence of Winkleski's disregard of the COVID risk.

But given the context of Huneke's entire email and the surrounding circumstances, no reasonable jury could conclude that Huneke's statement about wet-cell capacity was a ploy to mislead DOC officials about the COVID problem at NLCI. Huneke noted that the positive-

11

testing inmates had already been celled with their cellmates "for an extended period of time," Dkt. 21-2, at 2, which gets to the core problem for prison officials trying to stop the spread of a highly contagious disease like COVID-19: there was a near certainty that the 50 COVID-positive inmates had already infected many of the surrounding inmates. Placing those 50 inmates in wet cells wouldn't end the outbreak, and the transfer of COVID-positive inmates through the prison might risk further spread. In his response to Huneke, La Voie explained why he considered this alternative futile: "Those 50 positives have already exposed the rest of their unit, including cellmates." *Id.* at 2. So there didn't appear to be any confusion on La Voie' part about the true scale of the problem.

Also, Huneke directly raised a different alternative that Shipp contends should have been implemented instead of the quarantine-in-pace directive: shifting inmates within units to pair COVID-positive inmates with each other and pairing negative-testing close contacts with each other. It's implausible that Huneke would have raised this alternative if she were trying to misleadingly steer DOC officials into accepting a quarantine-in-place policy as the only feasible available option remaining. Both La Voie and Bekx rejected the option of shifting inmates within each unit because of the spread of COVID-19 that would already have occurred within each unit. Because no reasonable jury could infer that Huneke or Winkleski attempted to mislead La Voie and Bekx about the circumstances at NLCI to justify their quarantine-in-place plan, there isn't any reason for me to disregard the advice that they received from La Voie and Bekx or to otherwise consider Huneke's or Winkleski's intentions regarding the email chain as malign.

I take Shipp to be contending that regardless of Winkleski's intentions with respect to the October 2020 emails, Winkleski later consciously disregarded Shipp's rights by

implementing the proposed quarantine-in-place policy in B Unit after 145 inmates tested positive there in early November 2020 even though there were more effective policy options available. Shipp argues that there was no need for Winkleski to resort to keeping close contacts with their COVID-positive cellmates, and he offers two different alternatives: (1) staff could have followed the previous practice of placing COVID-positive inmates in wet cells because the prison had capacity for 300 inmates in wet cells; or (2) staff could have sorted inmates in B Unit so that all COVID-positive inmates were paired with positive cellmates and all close contacts were paired with other close contacts. It is undisputed that B Unit is further divided into two sides with the ability to limit contact between the two halves. Shipp suggests that either of his proposed policy alternatives could have been carried out by moving large groups of prisoners into the prison's gym while shifting other groups of inmates to their new destinations and disinfecting cells. It is undisputed that staff has moved whole units into the gym for hours at a time while conducting "shakedowns" of the unit cells.

But to win his Eighth Amendment claim against Winkleski, Shipp must show that Winkleski enforced a quarantine-in-place policy that he knew posed a substantial risk of serious harm to inmates, not just that Winkleski made a poor decision when choosing among different quarantine options. Claims involving complex policy decisions by supervisors are often difficult for prisoners to win because this court generally grants prison administrators "substantial discretion to devise reasonable solutions to the problems they face." *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020) (internal quotation omitted). This case is ultimately not just about how Winkleski treated Shipp's medical needs, but rather how Winkleski treated the medical needs of the entire NLCI population. Shipp undersells the risks involved with mass movements of prisoners under either of his proposed alternatives. Moving all 282 inmates who tested

13

positive into the prison's wet cells would force migration of hundreds of inmates through the prison into the C unit and restrictive housing unit. Shipp does not provide any evidence whether it would even be feasible to clear out the restrictive housing unit (which presumably housed inmates posing security risks) to house COVID-positive inmates.

Even if staff took the less drastic option of sorting COVID-positive and close-contact inmates within the units themselves, inmates from four different units would be shuttled in and out of the gym, risking further transmission between units. Shipp states that B Unit COVID-positive inmates could be segregated on one side of the unit, but that appears to be incorrect given that well more than half of the B Unit inmates tested positive. And none of these alternatives would assuredly isolate all COVID-positive inmates, because it is a virtual certainty that some of the close contacts who tested negative on November 2 were indeed infected by November 5. Placing inmates with undetected infections in close contact with inmates who were not yet infected could have prolonged the outbreak.

Shipp disputes defendants' account of whether the prison implemented some of its recommended COVID-mitigation measures such as the delivery of meals and medications at inmates' cell fronts and the modification of shower schedules, by which I take him to suggest that Winkleski more generally did not take COVID-19 seriously enough. But even adopting Shipp's version of the facts, it is undisputed that the prison tried various mitigation measures before and during the outbreak at issue. Even considering the evidence of previous mitigation efforts or staff's failure to undertake particular measures regarding meals, medications, or showers, there is not nearly enough evidence to lead a reasonable jury to conclude that Winkleski consciously disregarded inmates' medical needs when he implemented the quarantine-in-place policy. That doesn't mean that Winkleski picked the *best* policy. At

summary judgment I cannot rule out the possibility that Shipp's proposed alternatives or some other alternative not raised here might have resulted in less spread of COVID-19 than the quarantine-in-place option that Winkleski chose. But whether Winkleski chose the best possible option is not the appropriate question for the Eighth Amendment analysis. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) ("A defendant with knowledge of a risk need not "take perfect action or even reasonable action . . . his action must be reckless before § 1983 liability can be found." (internal quotation omitted)).

Faced with a difficult choice—and with the approval of DOC medical supervisors—Winkleski decided to keep inmates in place, which almost certainly did lead to some close contacts being infected. It is understandable why Shipp brought this lawsuit: inmates like him had the most to lose under the quarantine-in-place policy option because they were forced to stay in cells with COVID-positive cellmates. But the bottom line is that no policy—neither the one Winkleski ordered nor Shipp's proposed alternatives—could guarantee a complete stop of the spread. And Winkleski ultimately chose a policy approved by the DOC medical supervisors, whose medical judgment he was allowed to rely on. Therefore, I will grant defendants' motion for summary judgment on Shipp's Eighth Amendment claim against Winkleski.

### 2. Defendant Lobenstein

Shipp also brings an Eighth Amendment claim against defendant Unit Manager Lobenstein for failing to move him out of a cell with his COVID-positive cellmate. But it is undisputed that Lobenstein merely carried out Winkleski's quarantine-in-place order. Shipp argues that Lobenstein "can refuse an illegal directive" Dkt. 28, ¶ 42. Shipp is correct that "generally, there is no 'just following orders' defense in cases brought under 42 U.S.C. § 1983." *Kyle v. Holina*, No. 09-cv-90-slc, 2009 WL 1867671, at *2 (W.D. Wis. June 29, 2009). But

here, Lobenstein was following an order that I have already concluded did not violate Shipp's constitutional rights, so I will grant defendants' motion for summary judgment on the claim against Lobenstein as well.[1]

## C. Negligence claims

Shipp also brings Wisconsin-law negligence claims against Winkleski and Lobenstein. The court would have supplemental jurisdiction over those claims under 28 U.S.C. §1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action. Shipp doesn't allege any other basis for federal jurisdiction over the state-law claims. But absent unusual circumstances, district courts will relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over Shipp's state-law claims. Additionally, it seems clear that Shipp intends to bring additional negligence claims based on discovery showing that other state officials, such as Huneke, Bekx and La Voie, were involved in the decision to quarantine negative-testing inmates with their positive-testing cellmates. I will decline to exercise subject matter jurisdiction over Shipp's state law claims. Shipp may refile those claims in state court, subject to the applicable Wisconsin statute of limitations.

---

[1] Defendants also contend that they are entitled to qualified immunity on Shipp's Eighth Amendment claims. Because I am dismissing Shipp's claims on the merits, I need not consider defendants' qualified immunity arguments.

ORDER

IT IS ORDERED that:

1. Plaintiff Booker T. Shipp's motion for discovery sanctions, Dkt. 31, is DENIED.

2. Plaintiff's motion for leave to file a sur-reply, Dkt. 38, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 17, is GRANTED with respect to plaintiff's Eighth Amendment claims.

4. Plaintiff's state law claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered July 5, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge