IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BOOKER T. SHIPP,

                Plaintiff,

   v.

KENNETH LOBENSTEIN, DANIEL WINKLESKI,
ROSLYN HUNEKE, PAUL BEKX,
and DANIEL LA VOIE,

                Defendants.

OPINION and ORDER

21-cv-167-jdp

---

Plaintiff Booker T. Shipp, proceeding without counsel, is a prisoner currently incarcerated at Racine Correctional Institution. Shipp alleges that when he was at New Lisbon Correctional Institution, staff knowingly exposed him to COVID-19 by quarantining him with his cellmate who had tested positive. He brings claims under the Eighth Amendment to the United States Constitution and Wisconsin negligence law.

This case is on remand from the Court of Appeals for the Seventh Circuit after I had granted summary judgment to defendants. Defendants again move for summary judgment. Dkt. 79. I will grant that motion concerning Shipp's Eighth Amendment claims. Although Shipp was indeed quarantined with a COVID-positive inmate, the evidence shows that defendants made reasonable quarantine-policy choices when faced with difficult decisions about stopping the spread of COVID-19 in the prison. I will relinquish the court's supplemental jurisdiction over Shipp's state-law claims.

PROCEDURAL BACKGROUND

I granted defendants' first motion for summary judgment on Shipp's Eighth Amendment claims against defendants Warden Daniel Winkleski for adopting a "quarantine in place" policy housing him with a COVID-positive cellmate and against Unit Manager Kenneth Lobenstein for refusing to move him out of that cell. Dkt. 41. The court of appeals reversed that decision and remanded the case to this court with instructions to give Shipp more time to review late-disclosed emails between prison staff and the Bureau of Health Services about the adoption of the quarantine-in-place policy, to conduct additional discovery, and to amend his complaint to name additional prison officials involved in the relevant events. *Shipp v. Lobenstein*, No. 22-2260, 2023 WL 2424590, at *4 (7th Cir. Mar. 9, 2023). On remand, Shipp amended his complaint to add prison Health Services Unit Manager Roslyn Huneke and DOC Bureau of Health Services supervisors Paul Bekx and Daniel La Voie as defendants, all of whom were involved in adopting the quarantine-in-place policy, and I granted him leave to proceed on his Eighth Amendment and negligence claims against these officials. Dkt. 66. Defendants again move for summary judgment. Dkt. 79.

PRELIMINARY MATTER

During briefing of defendants' summary judgment motion, Shipp filed a series of motions stating that Racine Correctional Institution officials interfered with his initial attempt to file his summary judgment opposition. Dkt. 87; Dkt. 88; Dkt. 96. Although the court had already received what appeared to be Shipp's second attempt at mailing his summary judgment materials, the court directed defendants to respond to the allegations of mail tampering. Dkt. 103.

2

Defendants have responded with video footage that Shipp requested for the half-hour window on February 5, 2024, in which he stated that he placed a large manila envelope containing his summary judgment materials into the prison mail stream, Dkt. 106-1 (placeholder entry for the footage); a declaration from correctional officer Bernhard Ralph, one of the officers with whom he interacted regarding the mailing of the envelope, Dkt. 105; and records concerning Shipp's grievance about the incident, Dkt. 106-2.

Officer Ralph states the following: Shipp approached him about mailing a manila envelope, and Ralph told Shipp that he needed to attach a disbursement request form. Shipp filled out that form, had another officer sign it, and Shipp placed his envelope into a locked wooden mailbox. A few minutes later Ralph opened the mailbox, removed all mail from it, placed the mail into a locked mailbag, and took the mailbag out of the unit to be picked up by a grounds officer.

The video footage provided by defendants isn't conclusive: Ralph's body blocks the camera as he appears to place the mail into the locked mailbag, and one cannot see for certain whether Ralph later carries that particular mailbag out of the unit. But nothing in the video contradicts Ralph's account or otherwise shows signs of tampering with Shipp's mail, although the parties seem to agree that Shipp's envelope was indeed not mailed the first time around.

I'm satisfied that there isn't any further action this court can take regarding the mailing incident. Shipp asks the court to initiate a criminal investigation onto the matter but this court cannot order such an investigation. The court has received and accepted Shipp's summary judgment opposition, so he has not been prejudiced. I will now turn to defendants' summary judgment motion.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Booker T. Shipp is a prisoner at New Lisbon Correctional Institution (NLCI). Some of the defendants worked at NLCI: Daniel Winkleski was the warden, Roslyn Huneke is a nurse who was NLCI's Health Services Unit supervisor, and Kenneth Lobenstein was a unit manager. During the events relevant to this case, Lobenstein was the unit manager for B Unit, where Shipp was housed. Defendants Dr. Paul Bekx and Dr. Daniel La Voie worked for the Department of Corrections Bureau of Health Services: Bekx was the medical director and La Voie was the associate medical director.

NLCI is a medium-security prison with four housing units (A through D), each with about 125 cells, two inmates to a cell, and a restrictive housing unit with 50 single-occupancy cells. Each of the units were further divided into two "sides," with inmates from one side needing permission to enter the other side. In November 2020, NLCI housed approximately 1,020 inmates, which the parties agree was at or exceeding the ordinary capacity.

Starting in March 2020, NLCI issued guidance for inmates and staff aimed stopping the spread of COVID-19. For instance, NLCI recommended inmates and staff wash hands regularly with soap and water for at least 20 seconds; avoid touching their eyes, nose, and mouth; cover coughs or sneezes; keep their living and work areas clean; wear a mask; and maintain social distancing whenever possible. Winkleski also directed restrictions on inmate movement to mitigate the spread of COVID-19, such as adjustment to dayroom hours to separate quarantined and non-quarantined inmates, distribution of meals and medications to quarantined inmates at cell fronts, suspension of in-person visits, and modification to shower schedules. Shipp disputes whether some of these directions were carried out, for instance

stating that he never saw meals or medications being delivered at cell fronts. He also states that shower schedules were not modified, nor were inmates given extra bars of soap or cleaning supplies.

When there were relatively low numbers of COVID-19 infections at NLCI, inmates who tested positive were treated differently from those who were exposed but who did not test positive. Defendants state that an inmate who tested positive was placed on "isolation status" in a single "wet" cell—a cell with its own toilet and sink. Staff cleared a wing of the restrictive housing unit to create 14 isolation cells, and that because NLCI's C Unit's 125 cells are wet cells, when there was an outbreak on that unit NLCI was able to move inmates around the unit to create isolation cells on the unit. Inmates who were close contacts but who did not test positive were placed in "quarantine" status. The parties do not discuss the difference between isolation status and quarantine status in detail, but I take them to be saying that quarantined inmates were not placed in wet cells and so they shared the same showers and bathrooms as non-quarantined inmates. The parties also use the term "quarantine" more generally to refer to the separation of COVID-positive or close-contact inmates from the other inmates, which I will also do throughout this opinion.

Winkleski states that in establishing COVID-mitigation practices, he relied on NLCI Health Services Unit staff and the Bureau of Health Services. Shipp produces evidence stating that NLCI staff also considered guidelines from the United States Centers for Disease Control and Prevention and the Wisconsin Department of Health Services. *See, e.g.*, Dkt. 21-5 (memo from Winkleski to Shipp) ("We are adhering to CDC and DHS guidelines to the best of our ability on a medium security institutional setting."); Dkt. 82-6, at 3 (Defendant Huneke's

response to Shipp's second set of interrogatories) ("Within the facility, we also referenced the current CDC guidelines when making our decisions.").

An August 28, 2020 memo from non-defendant Deputy Warden Timothy Thomas stated that if upcoming mass testing by the National Guard revealed too many COVID-positive inmates to be housed in restricted housing, they would be housed in C Unit side 2, and if that unit reached capacity, staff would "attempt to use the other available wet cells to isolate" and then isolate in general population if necessary. Dkt. 89-3.

This case focuses on NLCI's response to a COVID-19 outbreak in October and November 2020. In mid-October, COVID testing was performed on two of the four units at the prison; I infer that it was the C and D units. There were 50 positive test results. The DOC's Bureau of Health Services COVID-19 policy at the time (which is titled "COVID Grid" because it organizes various types of quarantine types and actions into columns and rows) stated, "Do not place a person who needs to be quarantined with an isolated person. Those already quarantined and/or awaiting test results may need to remain in place with others before moving to avoid possible COVID-19 spread. Consult with BHS for additional questions re: movement of isolated or quarantined [prisoners]." Dkt. 21-2, at 5.

In response to the large number of positive tests, Winkleski asked Huneke to seek guidance from Bureau of Health Services supervisors Bekx and La Voie. On October 19, 2020, Huneke sent an email to Bekx and La Voie stating in part the following:

> We got most of the results back today and have 50 positive COVID cases from this so have quite a lot of inmates to isolate and quarantine. We do not have wet cells to move all the isolated inmates into, so what I would like to do is isolate and quarantine them in their current cell with their current cellmates. Some of the cellmates tested negative last week. We would quarantine them as close contacts anyways, but usually we can move the positive cases to a different cell. Warden Winkleski asked that I

6

confirm with BHS that isolating and quarantining in place is acceptable. On the [COVID Grid] which is attached, in the notes section it states "do not place a person who needs to be quarantined with an isolated person. Those already quarantined and/or awaiting test results may need to remain in place with others before moving to avoid possible COVID spread. . . .

Since the positive cases and their cellmates have been in the same cell for an extended period of time, I would prefer to leave them where they are rather than try to move them around to get 2 positive inmates in the same cell and 2 quarantined inmates in the same cell. If we had open available cells, we could certainly move them but since space is not available, would it be ok to leave them where they are?

*Id.* at 2. The next day, La Voie responded in part:

What you described is how I think we should handle this outbreak. Cohorting in place is the best option. Everyone is 'locked down in place' with little to no movement. Those 50 positives have already exposed the rest of their unit, including cellmates. Leave in place for at least 2 weeks. . . . As an example, GBCI went from 0 to 265 on repeat testing. We did as above and had only 30 cases subsequently. Today we are testing again. I will update you on how we have done with this strategy.

*Id.* Bekx also responded later that day, stating in part, "Whenever feasibl[y] possible, it is best to cohort positives and quarantines together—however in situations like this where there is likely already spread from a positive person to the roommate, it makes sense to simply restrict all movement." *Id.* at 1.

La Voie states that the COVID Grid's "first line recommendation[]" telling prisons not to keep close contacts with COVID-positive inmates wasn't suitable to "mass outbreak conditions." Dkt. 82-4, at 2–3. Quarantining in place was the best option available given the outbreak because it was very likely that large numbers of prisoners had already been exposed even if they had not yet tested positive, and moving infected prisoners around the prison would likely expose others. *Id.*

The parties do not explicitly state that Winkleski formally implemented the quarantine-in-place policy in the two units with the outbreak, but that's the only reasonable inference from the parties' summary judgment materials. About a week later, Winkleski issued a memorandum further modifying movement in the dry-cell units (A, B, and D), including Shipp's. Those restrictions included separate in-unit medication-pass and meal times for inmates in isolation or quarantine status and limitations on dayroom time, phone calls, the use of kiosks, showers, virtual visits, property, and inter-unit movement. I infer from this memo that there were inmates in each unit placed on isolation or quarantine status in dry cells, even though Huneke's quarantine-in-place plan had not yet been applied to the A and B units. A few days later, Deputy Warden Thomas issued a memorandum and Winkleski issued an email clarifying those policies.

On November 2, 2020, the Wisconsin National Guard conducted mass COVID testing of NLCI inmates. On November 5, test results showed that 282 inmates had tested positive. In particular, on Shipp's B Unit, 145 inmates tested positive and 103 tested negative. Shipp tested negative but his cellmate tested positive.

On November 5, Winkleski sent an email to NLCI staff and a memo to NLCI inmates implementing the quarantine-in-place policy on the A and B units. Winkleski assumed that because so many B Unit prisoners tested positive, all inmates on that unit had sustained prolonged close contact with COVID-positive inmates in the three days after testing occurred but before the results were known. Implementation of the policy meant that none of the inmates in these units switched cells, and that the inmates who had tested positive were not separated from those like Shipp who had tested negative. Shipp continued to be housed with a COVID-positive cellmate.

Defendant Unit Manager Lobenstein explained to inmates who were required to quarantine that they would not be allowed to change cells, even if they tested negative, because the entire unit was being placed under isolation/quarantine status. Shipp asked Lobenstein to move him out of his cell with a COVID-positive inmate into a cell with another negative-testing inmate instead. While unit managers generally have authority to assign cells on their units, Lobenstein refused Shipp's request as conflicting with Winkleski's quarantine-in-place order. Shipp states that Lobenstein threatened him with discipline if he failed to comply with the quarantine-in-place order.

Shipp was again tested for COVID-19 on November 10. He tested positive. He suffered from a severe, bloody cough; body aches; headaches; loss of smell; and he vomited. Shipp feared for his health because he already suffered from severely high blood pressure.

I will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Eighth Amendment claims

Shipp contends that defendants knowingly exposed him to COVID-19 by quarantining him with his cellmate who had tested positive rather than transferring the COVID-positive cellmate elsewhere or moving Shipp to a cell with another inmate who had tested negative.

The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries

risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). I will assume for purposes of this opinion that exposing Shipp to COVID-19 was a serious enough risk to Shipp's health to violate the Eighth Amendment.

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). In the context of prison COVID-mitigation cases, the court of appeals has stated that this standard is met when "defendants [do] not 'respond reasonably'" to the risk of harm. *Shipp*, No. 22-2260, 2023 WL 2424590, at *5 (quoting *Farmer*). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Shipp must also show that defendants' actions or inactions harmed him. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). But the ultimate question is whether defendants "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The court of appeals has instructed that courts should consider the "totality of the circumstances" in evaluating the reasonableness of prison officials' COVID-mitigation procedures rather than considering "each aspect of the disputed actions in a vacuum." *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020).

Defendants contend that Shipp cannot prove that they harmed him. It is undisputed that Shipp tested positive for COVID-19 shortly after defendant Winkleski decided to keep all B Unit inmates in place despite some of them having already tested positive, including Shipp's cellmate. Defendants argue that Shipp cannot prove that his positive test was caused by Winkleski's quarantine-in-place order because is possible that Shipp had already contracted COVID-19 before the order. I conclude that even if a jury could reasonably infer that Shipp was indeed infected because of Winkleski's quarantine-in-place order, Shipp cannot prevail on his Eighth Amendment claims because he fails to show that any of the defendants acted unreasonably in adopting COVID-mitigation measures or otherwise consciously disregarded the risk of harm to him.

### 1. Defendants Huneke and Winkleski

On remand, Shipp added Huneke as a defendant. Huneke was the NLCI Health Services Unit supervisor who reached out to high-level BHS medical supervisors Bekx and La Voie about changing quarantine procedures at the prison after an initial outbreak of 50 positive prisoners in late October 2020. Shipp contends that Huneke violated his Eighth Amendment rights by requesting that Bekx and La Voie approve her suggestion to cohort entire units in place, and by misleading Bekx and La Voie into thinking that there were not enough wet cells to house the COVID-positive inmates. And Shipp contends that Winkleski went along with Huneke's deception by failing to correct her statement about the unavailability of wet cells and then implementing the quarantine-in-place policy that Huneke advocated for.

Shipp contends that quarantining entire units in place directly contradicted the DOC's COVID Grid and the CDC's guidance in place at the time. Shipp asks me to take judicial notice that the COVID Grid and the CDC's guidance "do[] not advise in any way" that it

11

would be appropriate to cohort test-confirmed COVID-positive inmates with close-contact inmates who had not tested positive. Dkt. 94. Shipp refers to the July 22, 2020 version of a CDC COVID guidance publication, a document provided to him by defendants in discovery, but neither party submits that document with their summary judgment materials. I've located that document on the CDC's website; I'll docket a copy of that document along with this opinion.[1] I'll deny Shipp's motion to take judicial notice about the substance of both the state and federal guidelines because the parties dispute the precise interpretation of those documents.

Shipp's characterization of the DOC and CDC guidance is largely correct: keeping COVID-positive inmates directly quarantined alongside inmates who hadn't tested positive is clearly not the best practice recommended by either set of guidelines. The state's COVID Grid flatly stated, "Do not place a person who needs to be quarantined with an isolated person." Dkt. 21-2, at 5. And the CDC guidelines state in part as follows:

> Ensure that **separate** physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually—do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19 (ideally individually; cohorted if necessary). The plan should include contingencies for multiple locations if numerous infected individuals and/or close contacts are identified and require medical isolation or quarantine simultaneously.

Page 6 of the CDC guidelines attached to this opinion (emphasis in original).

---

[1] Centers for Disease Control and Prevention, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," https://stacks.cdc.gov/pdfjs/web/viewer.html?file=https://stacks.cdc.gov/view/cdc/90859/cdc_9 0859_DS1.pdf.

But the guidelines are not as rigid as Shipp contends: the documents themselves make clear that their recommendations were not iron laws meant to apply to every situation. The DOC's COVID Grid included a statement that it was a "'living' document, subject to changes and guidance" from DOC medical staff and public health officials. Dkt. 21-2, at 5. And defendants point out that the CDC guidelines did not rule out quarantining entire units in place. *See* Dkt. 82-4, at 3 (Defendant La Voie's response to Shipp's first set of interrogatories) (The CDC guidelines "recognized . . . the possible need to utilize this fallback intervention."). Although the CDC guidelines stated that "[f]acilities should make every possible effort to individually quarantine cases of confirmed COVID-19, and close contacts of individuals with confirmed, or suspected COVID-19," that document acknowledged that "[c]ohorting should only be practiced if there are no other available options" and stated, "If an entire housing unit is under quarantine due to contact with an individual from the same housing unit who has COVID-19, the entire housing unit may need to be treated as a cohort and quarantine in place." Page 23 of the CDC guidelines attached to this opinion. The guidelines make clear that circumstances might dictate a departure from the default best practices.

And in any event, as I stated in my previous order, a violation of a prison policy alone does not violate the Constitution. *See, e.g.*, *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). The same holds true for guidance from the CDC. *Mays*, 974 F.3d at 823 ("The CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard."). The real question is whether any defendant acted unreasonably in adopting COVID-mitigation measures given the specific circumstances at NLCI.

Shipp contends that Huneke was "lying (or at least giving inaccurate information)" when she told Bekx and La Voie that there weren't enough wet cells in which to isolate the 50

13

COVID-positive inmates that late-October testing revealed, misleading them into believing they had no choice but to approve her suggestion to quarantine entire units in place. Dkt. 89, at 4. It is undisputed that NLCI had a total capacity to hold 300 inmates in wet cells—250 doubled up in C Unit cells and 50 in the restrictive housing unit. And Deputy Warden Thomas's August 28, 2020 memo stated that NLCI would try to use much of this capacity to isolate COVID-positive inmates if mass testing revealed an outbreak: they would first be placed in restricted housing, then in C Unit side 2, and then potentially in other wet cells. As Shipp notes, this plan seemed to track the CDC's recommendation that prison have "contingencies for multiple locations if numerous infected individuals and/or close contacts are identified." Page 6 of the CDC guidelines attached to this opinion.

So why did Winkleski and Huneke abandon that plan when a round of testing revealed 50 COVID-positive inmates? Defendants state that NLCI was essentially full to capacity during the times in question and that almost all of the wet cells were occupied; perhaps this is what Huneke meant when she said that there were not enough wet cells available. In any event, NLCI never contemplated using the prison's *entire* wet-cell capacity for isolating COVID-positive inmates. Defendants state they cleared out only one wing of the restricted housing unit—14 of the 50 single-occupancy cells—for COVID-19 isolation (presumably the rest of the cells were used for disciplinary segregation and the like), and Shipp does not provide evidence disputing this. Shipp argues that the August 28, 2020 memo stated that staff would use the entire restricted housing unit for isolation, but the memo is silent about how much of the restricted housing unit was earmarked for isolation or quarantine. And the memo explicitly states that only one side of C Unit (with room for roughly 125 prisoners) would be used. Defendants do not explain what the memo means by additional wet cells; I take this to be other

side of the C Unit, but even then the memo stated only that staff would "attempt" to use those cells.

Neither side adequately explains how many of the wet cells would have been available for quarantine purposes at the time Winkleski asked Huneke to reach out to Bekx and La Voie, nor do the parties do not explain precisely how many inmates were COVID-positive at any one time. Given the large number of wet cells theoretically available on C Unit and in restricted housing, I conclude that there is a reasonable inference that NLCI could have chosen to transfer out the inmates already in most of those wet cells to accommodate the 50 COVID-positive inmates revealed by mid-October testing, as well as their close-contact cellmates. And aside from wet-cell transfers, Shipp raises a plausible alternative: shifting inmates within dry-cell units to pair COVID-positive inmates with each other and pairing negative-testing close contacts with each other. Both of those options hewed closer to the best practices recommended by both the DOC COVID Grid and the CDC guidelines than Huneke's plan to quarantine-in-place COVID-positive inmates alongside their negative-testing cellmates.

Yet Huneke asked Bekx and La Voie to approve her quarantine-in-place proposal anyway. Huneke's discovery responses stating that (1) the only written quarantine plan was the DOC's COVID Grid; and (2) the only spots available for isolation were in the restricted housing unit suggest that she was unaware of the August 28, 2020 memo from Deputy Warden Thomas. If Huneke mistakenly thought that only 14 total cells were available, her decision to pursue quarantining-in-place might be negligent but it wouldn't violate the Eighth Amendment. But a reasonable jury could also infer that Huneke and Winkleski knew about the August 28 memo (it was sent to all staff), and in any case they knew that NLCI had hundreds of wet-cell beds ideal for isolation. So that leaves the question whether Huneke's

15

push for quarantining entire units in place instead, and Winkleski's acceptance of that plan, were unreasonable.

The evidence on that question leads me to the same place as my previous summary judgment decision. Shipp asserts that the 50 COVID-positive inmates and their cellmates could simply have been moved into either the restricted housing unit or C Unit but he doesn't consider any of the downsides to that option. Winkleski states that wet-cell capacity was "only a small consideration" in his decisions and that "[t]here was a bigger picture to include not only positive inmates but also those that had been exposed." Dkt. 82-1, ¶¶ 10, 12. Huneke states that because of the three-to-five day lag between COVID testing and officials receiving the results of those tests, COVID-positive inmates were in close contact with their cellmates for at least a few days. And La Voie noted in his response to Huneke that "[t]hose 50 positives have already exposed the rest of their unit, including cellmates." Dkt. 21-2, at 2.

So even if the cellmates tested negative, it was highly likely that many of them were infected by the time the results came back. That raises what I previously called the "core problem for prison officials trying to stop the spread of a highly contagious disease like COVID-19": many of the surrounding inmates in those unit had almost certainly already been infected by spending days in close quarters with the infected inmates. *See* Dkt. 41, at 12. Moving the 50 COVID-positive inmates and their cellmates to other units wouldn't end the outbreak in those units, and it would raise additional risk of spread by transferring infected inmates to other areas of the prison, and uninfected inmates into the units experiencing spread.

To win his Eighth Amendment claims against Winkleski and Huneke, Shipp must show that they pursued an unreasonable quarantine-in-place policy posing a substantial risk of serious harm to inmates, not just that they made a poor decision when choosing among

16

different reasonable quarantine options. Claims involving complex policy decisions by prison supervisors are often difficult for prisoners to win because this court generally grants prison administrators "substantial discretion to devise reasonable solutions to the problems they face." *Mays*, 974 F.3d at 820. And this case is not just about how defendants treated Shipp's medical needs, but rather how they balanced the medical needs of the entire NLCI population.

Shipp's claim against Huneke is premised largely on his belief that she lied to Bekx and La Voie about the availability of wet cells to mislead them into approving her preferred quarantine-in-place proposal, knowing that it would harm inmates. But I stated in my previous opinion that, given the context of Huneke's entire email and the surrounding circumstances, no reasonable jury could conclude that Huneke's statement about wet-cell capacity was a malicious ploy to mislead Bekx and La Voie about the COVID-19 problem at NLCI. Dkt. 41, at 11. The evidence that the parties have produced upon remand does not change that conclusion. In particular, it remains implausible that Huneke would have also floated to Bekx and La Voie one of Shipp's preferred alternatives—shifting inmates within the unit to pair COVID-positive inmates and to pair close-contact cellmates of the COVID-positive inmates— if she were trying to misleadingly steer DOC officials into accepting a quarantine-in-place policy as the only feasible available option remaining.

None of this means that Huneke's quarantine-in-place proposal was necessarily the *best* strategy. This choice almost certainly did lead to some close contacts being infected, perhaps more than would have become infected had NLCI taken a different course of action. But whether Huneke pursued the best possible option is not the appropriate question for the Eighth Amendment analysis. *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("The test of deliberate indifference ensures that the mere failure of the prison official to choose the best

course of action does not amount to a constitutional violation."). Rather, as the court of appeals stated in remanding the case, when implementing COVID-mitigation policies, the question is whether defendants responded unreasonably. *Shipp*, No. 22-2260, 2023 WL 2424590, at *5. The evidence here shows that Huneke did attempt to balance the various dangers associated with different proposed alternatives; a jury could conclude only that she proposed one of many reasonable potential mitigation policies.

As for defendant Winkleski, I take Shipp to be contending that he acted unreasonably at three different points. The first concerns his decisions to have Huneke consult with Bekx and La Voie and his approval of Huneke's quarantine-in-place plan for the units that first suffered the outbreak. Winkleski's decision to have Huneke consult with Bekx and La Voie didn't violate the Eighth Amendment: consulting with high-level DOC medical personnel clearly isn't unreasonable. Rather, it showed concern for the prison's ability to handle the outbreak. And Winkleski approved Huneke's plan only after it was approved by Bekx and La Voie. As I stated in my previous opinion, defendant prison officials who are not medical providers are generally entitled to defer to the decisions of medical staff. Dkt. 41, at 11 (citing *Giles v. Godinez*, 914 F.3d 1040, 1049–50 (7th Cir. 2019)).

Winkleski was entitled to rely on the DOC medical supervisors' opinions about how to best handle the outbreak. And more generally, it is undisputed that Winkleski led NLCI in constantly evolving its movement and sanitation policies to manage the unprecedented challenges posed by the pandemic and the elevated threat posed to congregate facilities like NLCI. As with Huneke, there isn't evidence sufficient for a reasonable jury to conclude that Winkleski unreasonably adopted the quarantine-in-place plan.

The second point concerns events that Shipp did not raise in response to defendants' original motion for summary judgment. Shipp states that the outbreak in his B Unit was caused by Winkleski's approval of the quarantine-in-place plan. He submits a declaration from Dynzel Jones, who was also an inmate on B Unit in October and November 2020, Dkt. 90, as well as a November 2020 interview/information form authored by Jones, Dkt. 89-2. On that form, Jones complained to staff that 11 B Unit inmates tested positive for COVID-19 in late October but they were not moved out of the unit, and he asked why that was. *Id.* A sergeant responded that he was unable to answer the question but that isolation or quarantine decisions were made by the unit manager, security director, and warden. *Id.* In his declaration, Jones states that he knows that those 11 inmates were infected because their cell doors were designated with "I" for "isolation." Dkt. 90. Jones believes those 11 inmates caused the larger outbreak in B Unit because, despite their isolation designation, they were not moved out of the unit, were not locked in their cells, and were allowed out of their cells "anytime they wanted" to use the bathroom or talk to officers or other inmates. *Id.*

The problem with this line of argument is that Shipp doesn't show that Winkleski's actions caused this problem. Winkleski didn't apply the quarantine-in-place policy to B Unit until early November 2020. And even if that policy had somehow been misapplied to the B Unit early, that policy did not allow inmates to leave their cells at any time to intermingle with uninfected inmates and staff. If Shipp means to litigate other aspects of the NLCI COVID-19 policies or their execution, those issues are not part of the claims in either his original or amended complaint, so I will not consider them further.

The third point is when Winkleski applied the quarantine-in-place policy to Shipp's B Unit, in early November 2020 after further testing revealed 282 COVID-positive inmates,

including 145 inmates in Shipp's unit. This resulted in Shipp, who tested negative, being quarantined in a cell with a COVID-positive cellmate. Shipp tested positive about a week later. As defendants argue, Shipp does not submit evidence showing that he caught COVID-19 from his cellmate *after* the quarantine-in-place policy was implemented as opposed to beforehand or from another source.

Even if Shipp could show that his infection was caused by the quarantine-in-place policy, that doesn't necessarily follow that Winkleski violated his Eighth Amendment rights. Shipp suggests that Winkleski should have again consulted with Bekx and La Voie given the shifting circumstances over the two weeks following the initial consultation. But my rationale for granting summary judgment to Winkleski regarding his initial decision to adopt the quarantine-in-place policy applies with at least the same force to Winkleski's later decision about Shipp's unit. The early November round of testing revealed that more than a quarter of the NLCI inmates were COVID-positive, and more than half of Shipp's unit. The concerns that Winkleski and Huneke had about wet-room availability and the threat of cross-contamination by large-scale inter- or intra-unit transfers were even greater by this point of the outbreak. And Bekx and La Voie had already approved the quarantine-in-place plan as applied to a smaller number of COVID-positive inmates. Winkleski didn't violate the Eighth Amendment by applying the medical-supervisor-approved policy to a unit with a worse outbreak.

It is understandable why Shipp brings his claims regarding the quarantine-in-place policy. That policy protected other prisoners at the possible expense of inmates like Shipp, who were forced to stay in cells with COVID-positive cellmates, and he may have caught COVID-19 from it. But the bottom line is that no policy—neither the one Winkleski ordered nor

Shipp's proposed alternatives—could guarantee a complete stop of the spread. And Winkleski ultimately chose a policy approved by the DOC medical supervisors, whose medical judgment he was allowed to rely on. I will grant summary judgment to defendants on Shipp's Eighth Amendment claims against Winkleski.

### 2. Defendants Bekx and La Voie

Shipp amended his complaint to include Bekx and La Voie as defendants, alleging that they gave NLCI officials permission to house infected inmates with uninfected inmates like Shipp despite knowing that there was adequate room to isolate the infected inmates in wet cells. Defendants argue that Winkleski didn't need permission from high-level medical officials to change COVID-mitigation procedures. Regardless, that wouldn't absolve Bekx or La Voie from personal responsibility over the change in quarantine policy because Winkleski sought their expert guidance about the issue.

Nonetheless, Shipp fails to show that Bekx or La Voie acted unreasonably. Shipp hasn't produced any evidence suggesting that Bekx and La Voie knew the precise number of wet cells available at NLCI. Rather, it is undisputed that they relied on Hueneke's assertion that there weren't cells available. Shipp also argues that Bekx's and La Voie's unreasonableness is shown by their lack of knowledge of the August 28, 2020 memo outlining NLCI's isolation plan. But he doesn't explain why high-level DOC medical staff would be aware of specific internal prison memos. The undisputed facts show that Bekx and La Voie based their approval of Huneke's quarantine-in-place plan on the information provided to them by Huneke and their experience with a similar plan working at Green Bay Correctional Institution. There isn't any evidence suggesting that their responses to Huneke were anything other than a good-faith attempt at

limiting the spread of COVID-19. I will grant summary judgment to defendants on Shipp's Eighth Amendment claims against these defendants.

### 3.  Defendant Lobenstein

Shipp brings an Eighth Amendment claim against defendant Unit Manager Lobenstein for refusing to move him out of a cell with his COVID-positive cellmate. But it is undisputed that Lobenstein merely carried out Winkleski's quarantine-in-place order. As he argued the first time around, Shipp argues that "following orders is not an excuse for violating [the] law." Dkt. 89, at 11. Shipp is correct that "generally, there is no 'just following orders' defense in cases brought under 42 U.S.C. § 1983." *Kyle v. Holina*, No. 09-cv-90-slc, 2009 WL 1867671, at *2 (W.D. Wis. June 29, 2009). But here, Lobenstein was following an order that I have already concluded did not violate Shipp's constitutional rights.

Shipp also argues that defendants didn't do enough to protect him as a high-risk inmate. The only defendant whom Shipp establishes knew about his elevated risk was Lobenstein; Shipp states that he told Lobenstein that he had high blood pressure, although he doesn't explain when he told him this. Even assuming he said this to Lobenstein when he asked to be moved from his cell, this one isolated remark comes nowhere close to showing that Lobenstein violated the Eighth Amendment by failing to seek accommodation or disregard the quarantine-in-place policy. I will grant summary judgment to defendants on this claim.[2]

---

[2] Defendants also contend that they are entitled to qualified immunity on Shipp's Eighth Amendment claims. Because I am dismissing Shipp's claims on the merits, I need not consider defendants' qualified immunity arguments.

**B. Negligence claims**

Shipp also brings Wisconsin-law negligence claims against defendants. The court would have supplemental jurisdiction over those claims under 28 U.S.C. §1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action. Shipp doesn't allege any other basis for federal jurisdiction over the state-law claims. Absent unusual circumstances, district courts will relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over Shipp's state-law claims. I will decline to exercise subject matter jurisdiction over Shipp's state law claims.

Shipp may refile those claims in state court, subject to the applicable Wisconsin statute of limitations. Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under [the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

ORDER

IT IS ORDERED that:

1. Plaintiff Booker T. Shipp's motion for judicial notice, Dkt. 94, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 79, is GRANTED with respect to plaintiff's Eighth Amendment claims.

3. Plaintiff's state law claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

4.  The clerk of court is directed to enter judgment accordingly and close this case.

Entered September 23, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge